

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

ADW:MG/VC                                   *271 Cadman Plaza East*
F. #2019R01654                              *Brooklyn, New York 11201*


November 19, 2025


<u>By ECF and E-Mail</u>

The Honorable Clay H. Kaminsky
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:     United States v. Zhi Dong Zhang
>         <u>Criminal Docket No. 21-302 (S-2) (BMC)</u>

Dear Judge Kaminsky:

   The government respectfully submits this letter in support of its request for a permanent order of detention against the defendant Zhi Dong Zhang. On October 23, 2025, the defendant was returned from Mexico to the United States where he had an initial appearance in the Southern District of Texas on October 24, 2025, pursuant to Rule 5(c)(3). The defendant will be arraigned before Your Honor on November 19, 2025, in the Eastern District of New York.

   As set forth below, the defendant directed the distribution and importation of large quantities of cocaine and methamphetamine into the United States and has ties to several drug cartels. He also laundered the drug trafficking proceeds through hundreds of different shell companies and bank accounts in the United States. Significantly, the defendant was initially arrested in Mexico pursuant to an extradition request and later fled after being released on house arrest. The defendant was returned from Mexico to the United States only after being detained in Cuba. Accordingly, the defendant is a fugitive, poses a serious risk of flight, and should be detained pending trial.

I.  <u>Background</u>

   On November 10, 2022, a grand jury sitting in the Eastern District of New York returned a second superseding Indictment charging the defendant with eight counts: international cocaine distribution conspiracy, in violation of 21 U.S.C. §§ 963, 960(b)(1)(B)(ii), 959(d) (Count One); international distribution of cocaine, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), 960(a)(3), 959(d) (Count Two); cocaine importation conspiracy, in violation of 21 U.S.C. §§ 963, 960(b)(1)(B)(ii) (Count Three); conspiracy to distribute and possess with intent to distribute cocaine and methamphetamine, in violation of 21 US.C. §§ 846, 841(b)(1)(A)(ii)(II) and 841(b)(1)(A)(viii) (Count Four); two counts of money laundering conspiracy, in violation of 18

U.S.C. §§ 1956(h), 1956(a)(1)(B)(i) and 1957(a) (Counts Five and Six); and two counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 1957(a) (Counts Eight and Ten).  The drug counts carry a mandatory minimum sentence of 10 years' imprisonment and the potential for life imprisonment.  The government estimates that the defendant faces a Guidelines range of life imprisonment.

The defendant is also named in an indictment in the Northern District of Georgia, charging him with cocaine and fentanyl distribution conspiracy, possession with intent to distribute cocaine, possession with intent to distribute cocaine and fentanyl, cocaine and fentanyl importation conspiracy, and money laundering crimes.  See No. 22-CR-294 (N.D. Ga.).

A.    Offense Conduct

Since at least 2016, the defendant has led a massive drug trafficking and money laundering organization in Mexico (the "Zhang DTMLO").  The defendant and his co-conspirators imported thousands of kilograms of narcotics, including cocaine and methamphetamine, into the United States and other countries.  During the investigation, law enforcement made numerous seizures of narcotics tied to this organization, including 46 kilograms of cocaine and 58 kilograms of methamphetamine from a residence located in Los Angeles, and almost seven kilograms of fentanyl from a hotel in Texas.[1]

The Zhang DTMLO also laundered the proceeds of its drug sales, and the drug sales of other drug trafficking organizations in Mexico, through numerous methods, including the use of shell companies and cryptocurrency.  To accomplish this, the Zhang DTMLO made false statements to financial institutions throughout the United States, including by providing false social security numbers or other fraudulent documents, so that they could open shell company bank accounts.

The conspiracy recruited individuals known as "banqueros" to open bank accounts at various banks on behalf of these companies, engage in money pickups at different money drop locations throughout the United States (including in the Eastern District of New York), deposit that money into the shell company bank accounts at different financial institutions across the United States, and wire the funds to other beneficiary accounts so that they could eventually be laundered outside of the United States.  The organization also had supervisors located in Mexico, known as "coordinators," who directed the banqueros at every step of the process, including buying and booking their travel to and within the United States, providing them with fake documents to use to open bank accounts in the United States, telling them where to pick up and deposit the narcotics proceeds, and even booking rideshares for them to travel to different financial institutions to deposit the proceeds.  In total, law enforcement identified more than 100 shell companies tied to the organization that were used to launder at least $77 million in narcotics proceeds.

---

[1]    The Indictment charges the defendant with criminal acts occurring between June 2016 and December 2021.  The government's evidence shows that the defendant continued to distribute narcotics, including fentanyl, and launder drug proceeds after the grand jury returned the Indictment.

Throughout his criminal conduct, the defendant himself regularly used aliases and false passports to travel in furtherance of his organization's activities and to protect his identity. For example, in 2017, the defendant was stopped entering Canada with a false passport and money laundering ledgers. In 2018, the defendant was stopped entering Costa Rica with a forged identity and $70,000 in cash.

For the defendant's crimes, the United States designated the defendant a Consolidated Priority Target ("CPOT"), meaning the United States considers the defendant a leader of one of the most prolific drug trafficking and money laundering organizations in the world and an individual who has some of the greatest impact on the United States illicit drug supply.

B.    Arrest in Mexico and Subsequent Flight

On October 31, 2024, the defendant was arrested by Mexican law enforcement on a provisional arrest warrant related to this Indictment and the indictment in the Northern District of Georgia. The defendant was released to house arrest and fled Mexican custody. U.S. authorities understand that he was subsequently detained in Cuba, from where Mexican authorities returned him to the United States on October 23, 2025.

On October 24, 2025, the defendant had an initial appearance in the Southern District of Texas, where he was arraigned on this Indictment and on the indictment in the Northern District of Georgia. The defendant is scheduled to be arraigned on the Indictment in the Eastern District of New York on November 19, 2025.

II.    Legal Standard

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice." Id. (citation omitted). "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

The government may proceed by proffer to establish facts relevant to a detention determination. United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense involved a controlled substance or a firearm; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). In evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

A presumption of dangerousness and risk of flight arises when a defendant is charged with an offense under the Controlled Substances Act or the Controlled Substances Import and Export Act that carries a maximum term of imprisonment of 10 years or more. See 18 U.S.C. § 3142(e)(3)(A). Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question. See United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985).

III.    Argument

Due to the charges filed against the defendant, there is a presumption that there are no conditions of release that would reasonably assure the defendant's appearance and the safety of the community. See 18 U.S.C. §§ 3142(e)(3)(A). The defendant cannot rebut that presumption, regardless of any bail package that may be proposed, because the relevant considerations under the Bail Reform Act clearly support a finding of dangerousness and risk of flight. Based on the defendant's serious and years-long conduct of importing deadly drugs and laundering the proceeds of those sales, the penalties he faces upon conviction, the strong evidence of his guilt, and his ability and incentives to flee, the government respectfully submits that the defendant should be detained pending trial.

First, as set forth above, the defendant's crimes are serious. The defendant engaged in massive drug trafficking and money laundering crimes on an international scale, including the importation of lethal drugs like cocaine and methamphetamine that cause significant harm to the community. See United States v. Millan, 4 F.3d 1038, 1047-48 (2d Cir. 1993) ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'") (quoting United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985)). Further, the defendant repatriated his criminal earnings through systematic deception to financial institutions and to law enforcement, reflecting a degree of criminal sophistication that also risks harm to the community.

Second, the defendant faces severe penalties if convicted at trial. "The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence." United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022). Here, if the defendant is convicted at trial, he faces a mandatory minimum sentence of 10 years' imprisonment and up to life imprisonment. And as described earlier, the government estimates that the defendant faces a Guidelines range of life imprisonment if convicted at trial.

Third, the weight of the evidence against the defendant is overwhelming. The government intends to prove the defendant's guilt at trial through, among other things, (1) witness testimony, (2) messages, photographs, videos and other materials recovered from cellular telephones and email accounts, (3) extensive financial records, and (4) drug seizures. Where the weight of the evidence is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." Zhang, 55 F.4th at 151; United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").

Fourth, the defendant's history and characteristics weigh in favor of detention. The defendant used false identities and employed dozens of people to traffic drugs and launder money throughout the world. His crimes were meticulously planned. Moreover, the defendant continued to engage in his illegal conduct even after he was arrested in Canada in 2017 and Costa Rica in 2018. The defendant is a danger to the community and does not respect the rule of law.

Fifth, the defendant has the motive and means to flee if he chooses to do so. See Sabhnani, 493 F.3d at 76 ("[A] second factor strengthens the case for detention: defendants' ample means to finance flight."). The defendant is a Chinese citizen who lived in Mexico with minimal ties to the United States. The defendant was previously arrested in Mexico on this very Indictment and, when shown leniency through home detention, he fled. Further compounding the defendant's risk of flight is that he is skilled at hiding and disguising assets and has access to large sums of untraceable funds: the defendant used bogus shell companies, money pick-ups and deposits, and wire transfers as part of the scheme, much of which was converted into cryptocurrency. He is also skilled at using false identities and passports. Given these factors and the likelihood that a conviction carries a significant sentence, there is a substantial risk that the defendant will flee.

Finally, home detention and the use of an ankle monitor would not adequately prevent the defendant from fleeing, given the defendant's foreign citizenship, foreign ties, substantial means, and prior history of flight. As courts have observed, home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start. See United States v. Zarger, No. 00-CR-773-S-1 JG, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000). Indeed, similarly situated defendants have recently evaded the strictures of pre-trial detention and orchestrated flight from justice. Last year, a German national charged in this district with fraud in connection with a cryptocurrency, who was under home detention on a $5 million bond guaranteed by his domestic partner and children, tampered with his ankle bracelet monitor and absconded. See United States v. Horst Jicha, No. 23-CR-342 (OEM); see also United States v. Marius Lacatis, No. 22-CR-190 (BMC) (defendant, a Romanian national involved in a fraud conspiracy, was released on bond following his arrest in California and ordered to report to the Eastern District of New York; instead, he cut his location monitoring device, fled and remains at large); United States v. Julian Tzolov, 08-CR-370 (JBW) (defendant in a securities fraud scheme attempted to flee to Spain while on location monitoring).

5

IV.     Conclusion

        For the reasons set forth above, the government submits that the defendant is unable to overcome the presumption of detention and respectfully requests the Court detain him pending trial.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:        /s/
      Miranda Gonzalez
      Vincent Chiappini
      Assistant U.S. Attorneys
      (718) 254-7000

cc:     Clerk of the Court (by ECF)
       Defense counsel (by ECF)